UNITED STATES of America,
Appellee,

v.

Richard MCFADDEN, also known as Deebo, also known as Richard McFadden, also known as Richard McFadzean, Glen Flowers, also known as Big Dog, Lamont Jamal Williams, also known as K–Shaun, also known as K–Smooth, Alberto Flowers, also known as Sub Guns, also known as Guns, also known as Sub, also known as Valerie E. Bert, Randal Moody, also known as Rusell, also known as Randall Moody, Anthony Switzer, also known as Zo DE Tone, also known as Capone Tone, also known as TC; Kaleif Wynn, also known as Kai, Norman O. O'Neil, also known as Norman B. Leone, also known as Whitey, also known as Whitebread, also known as Whites, Moses Wellington, also known as Moses Goodwin, also known as Mo, Jamal Williams, Elijah Adams, also known as E, Curtis Collingwood James, also known as Curtis James, Levon Gee, also known as Devon Gee, also known as Von, Defendants,

Roy MOODY, also known as John Moody, also known as Allen Moody, also known as Butch Moody, also known as Shorty Watkins, also known as Roy Soden, also known as Kubot, Defendant–Appellant.

No. 02–1438.

United States Court of Appeals, Second Circuit.

July 14, 2003.

Sanford N. Talkin, Talkin & Muccigrosso, New York, NY, for Defendant–Appellant.

Daniel M. Gitner, Assistant United States Attorney, Southern District of New York (James B. Comey, United States Attorney for the Southern District of New York, on the brief; Laura Grossfield Birger, Assistant United States Attorney, of counsel), New York, NY, for Appellee.

Present: STRAUB, POOLER, Circuit Judges, and HURD, District Judge.*

### SUMMARY ORDER

**AFTER ARGUMENT AND UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the judgment of the District Court is hereby **AFFIRMED.**

Defendant–Appellant Roy Moody appeals from the September 13, 2002 judg-

---

* The Honorable David N. Hurd, District Judge of the United States District Court for the Northern District of New York, sitting by designation.

ment of the United States District Court for the Southern District of New York (John S. Martin, Jr., *Judge*) convicting him, following a jury trial, of one count of conspiracy to violate narcotics laws in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A). Moody also appeals his sentence of 540 months' imprisonment, five years' supervised release, and a $100 special assessment.

Moody challenges his conviction on the ground that he was denied a fair trial by the admission of irrelevant and prejudicial evidence, including evidence of murders for which he was not charged. Moody challenges his sentence on the grounds that the District Court erroneously (1) denied him a two-step reduction in offense level for his alleged minor role in the narcotics conspiracy; (2) applied a two-step upward adjustment for obstruction of justice; and (3) attributed to him over 1.5 kg of crack cocaine. For the reasons set forth below, we affirm Moody's conviction and sentence.

### I.

As early as 1996, Moody joined a narcotics conspiracy that specialized in purchasing powder cocaine in New York City, converting the cocaine into crack, and then selling it on the streets of Hudson, New York, and later New Bern, North Carolina. In June 1998, New York City police officers seized $44,900 from two members of the conspiracy who had traveled to New York from New Bern to buy cocaine. To make up for the shortfall caused by the unexpected seizure, members of the conspiracy–not including Moody–murdered and robbed their own drug customers in two separate incidents (the "Fred and Greenville murders") and used the proceeds to purchase cocaine in New York, this time successfully. The cocaine was taken back to North Carolina and "cooked" into crack. Moody was distributed a portion of that crack for immediate sale, and was present when the remaining crack, along with a gun, was concealed in a pillowcase in a trailer that the group routinely used for storing drugs, drug paraphernalia, and weapons.

On July 24, 1998, local officers investigating one of the murders searched the group's trailer. Before the officers arrived, Moody removed the pillowcase containing the gun and drugs from the trailer and buried the objects nearby. Moody was arrested a short time later for trespassing and for providing a false name to the officers.

By the beginning of 1999, Moody was again selling crack in New Bern. Tensions arose between members of Moody's narcotics organization and members of a rival gang after Dennis Boyd, a member of the rival group, shot a member of Moody's organization in the stomach. In retaliation, Moody set fire to a car that belonged to Boyd's girlfriend, stood by while two associates robbed Boyd's stepbrother at gunpoint, and himself threatened Boyd's brother with guns. On August 12, 2000, Moody allegedly shot and killed Boyd in order finally to resolve the ongoing dispute and also to pay off a drug debt Moody had incurred within his own organization. After the shooting, a member of the conspiracy brought Moody to the Bronx in New York, where he eventually was arrested and then tried and convicted in the instant case.

This timely appeal followed.

### II.

With respect to the conduct of his trial, Moody argues that the District Court erred in admitting evidence of the Fred and Greenville murders because the murders were committed in furtherance of a

wholly separate conspiracy than his own. This contention fails given the fact that members of Moody's conspiracy committed the murders expressly to obtain cash to purchase (in their view) much needed cocaine. That cocaine then was cooked into crack, delivered to one of the group's leaders, and distributed to Moody, among others, for sale. Based on this overwhelming showing, the District Court properly concluded that the murders were not part of a separate conspiracy.

Nor was the murder evidence, individually or in conjunction with other evidence, unduly prejudicial. The District Court conducted a number of hearings as to the relevancy and merit of the government's evidence, and weighed that evidence against any possible prejudicial effect. Moreover, the government was careful to make clear at trial that Moody never personally participated in the murders. We conclude, therefore, that the District Court acted well within its discretion.

### III.

■ Turning to sentencing issues, Moody first argues that the District Court erred in denying him a two-point reduction in offense level based on his alleged minor role in the offense. *See* U.S.S.G. § 3B1.2(b) (2001). We have repeatedly held that a defendant may not receive a minor role adjustment simply because he "played a lesser role than h[is] co-conspirators," and that "to be eligible for a reduction, the defendant's conduct must be 'minor' ... as compared to the average participant in such a crime." *United States v. Castano,* 234 F.3d 111, 113 (2d Cir.2000) (internal quotation marks omitted). Here, the PSR, which the District Court adopted, described Moody's lengthy and active involvement in the conspiracy, his awareness of integral aspects of the operation, his familiarity with the members of the group, and the affirmative, violent actions he took to further the success of the venture. In light of such significant participation by Moody, the District Court's decision to deny a downward adjustment under § 3B1.2(b) was not an abuse of discretion.

### IV.

■ Moody next argues that the District Court erred in imposing a two-level adjustment for obstruction of justice. *See* U.S.S.G. § 3C1.1 (2001). We disagree. To begin, the District Court must have found that Moody's obstructive conduct–his burying of the pillowcase as investigating officers arrived to search the group's trailer–"related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) an otherwise closely related case, such as that of a co-defendant." U.S.S.G. § 3C1.1 cmt. n. 1 (2001). Both of these criteria were met in this case. As the District Court concluded, "had [Moody] not hidden that gun and the crack [and] simply stayed in the trailer ... [the police officers] would have come in, [Moody and his coconspirators] would have been investigated, [and] they would have been arrested. This whole conspiracy would have ended at that point." Tr. at 30; *see United States v. McKay,* 183 F.3d 89, 95 (2d Cir.1999). Furthermore, for the same reason why evidence of the Greenville murders was relevant and admissible at trial, the police investigation of those murders was necessarily "closely related" to the conspiracy conviction.

■ Because § 3C1.1(A) provides that a defendant must have obstructed justice "during the course of the investigation, prosecution, or sentencing of the *instant* offense of conviction" (emphasis added), and because the officers were investigating only the Greenville murders when they arrived at the trailer, Moody argues that

he is not eligible for the enhancement. But the obstruction of justice enhancement remains appropriate where, as here, the obstructive conduct occurs subsequent to the onset of the offense of which the defendant is convicted, *see United States v. Fernandez,* 127 F.3d 277, 283 (2d Cir.1997); *United States v. Sisti,* 91 F.3d 305, 314 (2d Cir.1996), and the investigation obstructed necessarily entailed an inquiry into, and a likely discovery of, the larger crime of conviction, *see United States v. Norman,* 129 F.3d 1393, 1399 (10th Cir.1997).

■ Moody also argues that his conduct falls within the exception to § 3C1.1, which provides that concealing evidence "contemporaneously with arrest (*e.g.,* attempting to swallow or throw away a controlled substance) [ ] shall not, standing alone, be sufficient to warrant an adjustment for obstruction." U.S.S.G. § 3C1.1 cmt. n. 4(d) (2001). However, the evidence presented at trial established that Moody buried the drugs and gun *before* the police arrived at the trailer, not "contemporaneously with [his] arrest" which took place a short time later. Moody's conduct was not the type of reflexive action excepted by Application Note 4(d), but was clearly calculated and purposive. *See United States v. Stroud,* 893 F.2d 504, 508 (2d Cir.1990).[1]

### V.

■ Lastly, Moody argues that there was insufficient evidence to support the District Court's finding that he should be held responsible for at least 1.5 kg of crack cocaine. When addressing such a claim, we acknowledge that the District Court has "broad discretion to consider all relevant information," *United States v. Pico,* 2 F.3d 472, 475 (2d Cir.1993), and is "entitled to consider all transactions engaged in by [the defendant] or by his coconspirators ... if the transactions were either known to [the defendant] or reasonably foreseeable to him," *United States v. Podlog,* 35 F.3d 699, 706 (2d Cir.1994) (internal quotation marks omitted), *cert. denied,* 513 U.S. 1135, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995). We review for clear error a district court's determination of drug quantity made for the purpose of calculating a defendant's offense level. *United States v. Moreno,* 181 F.3d 206, 213 (2d Cir.1999), *cert. denied,* 528 U.S. 977, 120 S.Ct. 427, 145 L.Ed.2d 334 (1999).

The District Court determined that "there is [an] adequate basis of [Moody] being aware of the full scope of the conspiracy and, therefore, to be accountable for all of it," Tr. at 13. The District Court explicitly rejected Moody's argument that there were many independent drug operations rather than a single conspiracy, stating that "the fatal flaw ... in [Moody's] argument is they are all going back to the same basic supply. They may be taking it different places, but they are all getting the same supply and splitting it up and one decides to sell it in Greenville and one decides to sell it in New Bern." Tr. at 12. Given the evidence, we think it was entirely correct for the District Court to conclude that all of the drug transactions of the conspiracy, including those occurring in places other than New Bern, were reasonably foreseeable and thus attributable to Moody.

As there was no seizure of drugs in this case, the District Court was entitled to estimate the amount involved in the overall

---

1. We summarily reject Moody's contention that he lacked the requisite specific intent to obstruct justice. According to Moody's own brief, he was "[a]lerted that the police were probably on their way," and therefore took a pillowcase containing a stash of drugs and a gun and buried it. Moody's awareness that officers were approaching, combined with his efforts to bury the pillowcase, amply support the finding that "the defendant consciously acted with the purpose of obstructing justice." *United States v. Woodard,* 239 F.3d 159, 162 (2d Cir.2001) (internal quotation marks omitted).

narcotics conspiracy. *See* U.S.S.G. § 2D1.1 cmt. n. 12 (2001). At sentencing, the District Court determined that the evidence in the record sufficiently established Moody's responsibility for at least 1.5 kg of crack. The District Court adopted the government's suggested reasoning that the $44,900 seized from Moody's co-conspirators in 1998 would have purchased 2 kg of cocaine, which then would have been converted into at least 1.5 kg of crack. This calculation hinged on an assumption that the conversion of cocaine powder to crack is at a four-to-three ratio.

We need not decide whether the assumed conversion ratio is appropriate as the District Court heard ample other evidence as to drug quantity. *See United States v. Guevara,* 277 F.3d 111, 125–26 (2d Cir.2001), *cert. denied,* —— U.S. ——, 123 S.Ct. 1613, 155 L.Ed.2d 337 (2003). The evidence at trial established that Moody, among others, sold drugs for the narcotics organization over a period of five years. One co-conspirator testified that members of the conspiracy were supplied with crack in quantities of 28 grams, 14 grams, or 7 grams. Tr. at 101–02, 107. Another cooperating witness testified that, for a period of time around 1998, Moody was selling crack in New Bern on a daily basis and was with two or more co-conspirators who also were selling crack at least two to three times a week. Tr. at 434, 440–42. We thus cannot conclude that the District Court clearly erred in estimating that the entire narcotics conspiracy involved at least 1.5 kg of crack cocaine.

## VI.

Accordingly, for all the foregoing reasons, the judgment of the District Court is hereby **AFFIRMED.**